UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| STOP RECKLESS ECONOMIC INSTABILITY CAUSED BY DEMOCRATS, *et al.*, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-397 (AJT/IDD) |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) ) | |
| | ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Presently pending are cross-motions for summary judgment with respect to plaintiffs'

constitutional challenges to certain statutory contribution limits under the Federal Election

Campaign Act ("FECA") [Doc. Nos. 56 and 57]. Specifically, plaintiffs contend that (1) the six-

month registration period, 2 U.S.C. § 441a(a)(4), violates the First Amendment as applied to

plaintiff Stop Reckless Economic Instability Caused By Democrats ("Stop PAC"); (2) the limit

on contributions from persons to candidates, § 441a(a)(1)(A), violates the Fifth Amendment as

applied to Stop PAC; and (3) FECA's annual limits on contributions from multicandidate non-

connected political committees ("PACs"), like the Tea Party Leadership Fund (the "Fund"), to

national party committees, § 441a(a)(2)(B) ($15,000), and to state party committees,

§ 441a(a)(2)(C) ($5,000) violate the Fifth Amendment. Plaintiffs seek a declaration that these

provisions are unconstitutional and also a permanent injunction barring defendant Federal

Election Committee ("FEC") from enforcing them against plaintiffs and similarly situated

groups. For the reasons stated herein, the Court will assume, without deciding, that plaintiffs

have standing to raise their claims and that their claims are not moot, but concludes that the

FECA's challenged limitations on campaign contributions are constitutional.  Summary

judgment will therefore be granted in favor of defendant FEC.

## BACKGROUND

On April 14, 2014, the original plaintiffs filed a complaint against defendant FEC [Doc.

No. 1], challenging the constitutionality of certain FECA contribution limits. [1]  More specifically,

plaintiffs Stop PAC, the Fund, and the Alexandria Republican City Committee ("ARCC") and

intervenor American Future PAC ("American Future") (referred to collectively as "plaintiffs")

allege that FECA, as amended by the Bipartisan Campaign Reform Act ("BRCA"), 52 U.S.C.

§§ 30101-46 (formerly 2 U.S.C. §§ 431-57), unconstitutionally and discriminatorily places

different contribution limits on materially indistinguishable political committees based on

whether a committee has been in existence for six months.  FECA requires that newly registered

PACs wishing to contribute to candidates comply with a $2,600 limit for six months before

earning an increased $5,000 limit reserved for multicandidate PACs.  In that regard, Stop PAC

and American Future argue that (1) the $2,600 limit on contributions from persons (or new

PACs) to candidates, 2 U.S.C. § 441a(a)(1)(A), violates the equal protection component of the

---

[1] The original plaintiffs were Stop PAC, Niger Innis, Niger Innis for Congress, Tea Party Leadership Fund, and Alexandria Republican City Committee. On July 3, 2014, plaintiffs filed a motion to voluntarily dismiss plaintiffs Niger Innis and Niger Innis for Congress [Doc. No. 35], which the Court granted [Doc. No. 46]. On July 7, 2014, plaintiffs filed an Amended Complaint [Doc. No. 37] ("Am. Compl."), and also sought leave, if necessary, to file the amended complaint pursuant to Fed. R. Civ. P. 15(a)(2) and (d) [Doc. No. 36], which the Magistrate Judge granted on July 24, 2014 [Doc. No. 47].  On August 27, 2014, plaintiffs filed a motion to join American Future PAC [Doc. No. 51].   The Magistrate Judge entered an Order allowing American Future to intervene in this suit pursuant to Fed. R. Civ. P. 24 [Doc. No. 62].  On September 19, 2014, the parties filed cross-motions for summary judgment [Doc. Nos. 56, 57]. On October 31, 2014, the Court heard argument on the parties' cross-motions for summary judgment, following which it took the motions under advisement, with leave to file by November 14, 2014 any supplemental briefs pertaining to intervenor American Future, with responses thereto by November 21, 2014 [Doc. No. 67], all of which the parties timely filed. *See* Doc. Nos. 68, 69, 71, 72.

2

Fifth Amendment as applied to Stop PAC (Count I);[2] and (2) the six-month registration and waiting period for designation as a "multicandidate political committee," 2 U.S.C. § 441a(a)(4), violates the First Amendment as applied to Stop PAC (Count II).[3]  In addition, FECA sets a higher limit for contributions made by persons, as opposed to those made by multicandidate PACs, to party committees.[4]  In plaintiffs' third claim, ARCC and the Fund argue that FECA's annual limits on contributions made by multicandidate PACs to national party committees under 2 U.S.C. § 441a(a)(2)(B) ($15,000) and to state party committees under § 441a(a)(2)(C) ($5,000) violate the equal protection component of the Fifth Amendment (Count III).

---

[2] 52 U.S.C. § 30116 (formerly cited as 2 U.S.C. § 441a and changed in September 2014) provides, in relevant part: "[N]o person shall make contributions to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $2,000." 52 U.S.C. § 30116(a)(1)(A). At the time of the parties' briefing, the statutory figure had been adjusted for inflation to $2,600. *See* 78 Fed. Reg. 8,530, 8,532 (Feb. 6, 2013). On February 3, 2015, the limit was increased under FECA to $2,700 to account for inflation. *See Price Index Adjustments for Contribution and Expenditure Limitations*, 80 Fed. Reg. 5750-02, 5752 (Feb. 3, 2015).

[3] A "multicandidate political committee" is defined as "a political committee which has been registered under section 30103 of this title for a period of not less than 6 months, which has received contributions from more than 50 persons, and, except for any State political party organization, has made contributions to 5 or more candidates for Federal office." 52 U.S.C. § 30116(a)(4).

[4] Per 52 U.S.C. § 30101(11), a "person" "includes an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons." A person can contribute $32,400 annually to a national party and $10,000 annually to a state or local party committee. § 30116(a)(1)(A), (B), (D). Section 30116(a)(2)(B) provides: "No multicandidate political committee shall make contributions to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year, which, in the aggregate, exceed $15,000."

3

## FACTS [5]

Plaintiff Stop PAC is a hybrid non-connected political committee that registered with the

FEC on March 11, 2014.   Stop PAC is registered and based in Virginia. Of its contributors, 78

contributors reside in Nevada, and its founder and chairman, Greg Campbell, also resides there.

As of April 10, 2014, Stop PAC had over 150 contributors and had contributed to five candidates

for federal office.   Section 441a(a)(1)(A) of FECA limited Stop PAC's contributions to each

federal candidate to $2,600 per election until September 11, 2014, when Stop PAC became a

multicandidate PAC and was permitted to contribute $5,000.

Former plaintiff Niger Innis was a candidate in the June 10, 2014 primary election for the

Republican Party nomination for the U.S. House of Representatives in Nevada ("Nevada

Primary").   As of April 10, 2014, Stop PAC had contributed $2,600 to Niger Innis for the

Nevada Primary.  Stop PAC wished to contribute an additional $2,400 to Innis in connection

with the Nevada Primary, but section 441a(a)(1)(A) prohibited it from doing so because Stop

PAC had not been registered with the FEC for more than six months.  The Nevada Primary

occurred before Stop PAC's six-month waiting period expired.

On June 16, 2014, Stop PAC contributed the statutory maximum of $2,600 to Dan

Sullivan, a candidate for the Republican nomination for U.S. Senate in Alaska's August 19, 2014

primary election ("Alaska Primary").  Stop PAC wished to contribute an additional $2,400 to

Sullivan in connection with the Alaska Primary, but section 441a(a)(1)(A) prohibited it from

doing so because it had not been registered for more than six months before the Alaska Primary.

The Alaska Primary occurred before Stop PAC's six-month waiting period expired.  On July 7,

---

[5] Because this matter comes before the Court on cross-motions for summary judgment, the recited facts are either uncontested or stated most favorably to the plaintiffs and intervenor American Future.

2014, Stop PAC contributed $2,600 to Congressman Joe Heck in connection with his candidacy in the 2014 general election. At that time, Stop PAC had an additional $1,800 that it wished to contribute immediately to Heck, but could not until its six-month waiting period expired on September 11, 2014. Thereafter, on October 3, 2014, after acquiring multicandidate status, Stop PAC contributed an additional $1,800 to Heck for the November 2014 general election.

Intervenor American Future is a non-connected political committee that registered with the FEC on August 11, 2014, and qualified as a multicandidate PAC on February 11, 2015. Its purpose is to "stand for veterans who have secured our freedom." By August 22, 2014, American Future had raised $5,473 from 54 contributors, $5,000 of which was received on August 18, 2014 from a single donor; 41 of those contributions were for five dollars, and three were for one dollar. On August 19, 2014, American Future contributed $2,600 to Tom Cotton's general election campaign for U.S. Senate, and then contributed $100 each to four other candidates. American Future wished to contribute an additional $2,000 to Cotton in connection with the 2014 general election, but section 441a(a)(1)(A) prevented it from doing so because it had not been registered with the FEC for six months before the November 2014 general election. American Future made no contribution to any candidate after August 25, 2014. At the time of its intervention, American Future also argued that it wished to contribute funds in excess of $2,600 to Cotton immediately, but, due to the six-month waiting period, could not unless and until Cotton filed paperwork concerning the 2016 primary election, and that it reasonably anticipated wanting to contribute funds in excess of $2,600 to other candidates for the 2016 primary election at the earliest available opportunity. American Future expected that many candidates would begin filing the paperwork necessary to begin fundraising for the 2016 primary election in December 2014 or January 2015.

5

Plaintiff ARCC is a local political party committee that is affiliated with the Virginia Republican State Committee, a state political party committee. The ARCC contends that its rights to receive contributions from the Fund and other PACs have been infringed as a result of FECA.

Plaintiff the Fund is a hybrid non-connected multicandidate PAC that registered with the FEC in 2012. By May 2014 the Fund had over 100,000 contributors and it has contributed to dozens of federal candidates. As such, the maximum amount that it may contribute to a state political party committee and local affiliates under section 441a(a)(2)(C) of FECA is $5,000 each year. If the Fund had been registered with the FEC for less than six months, it would have qualified as a "person" rather than a "multicandidate political committee," and been permitted to contribute up to $10,000 each year to a state political party committee and its local affiliates. *See* § 441a(a)(1)(D). The maximum amount that federal law permits it to contribute to a national political party committee is $15,000 annually. *See* § 441a(a)(2)(B). If the Fund had been registered with the FEC for less than six months, it would have qualified as a "person" and been permitted to contribute up to $32,400 each year to a national political party committee. *See* § 441a(a)(1)(B). In 2014, the Fund contributed the statutory maximum of $5,000 to the ARCC, a local political party committee. The Fund wishes to contribute an additional $5,000 to the ARCC for a total of $10,000 in 2014. In addition, the Fund wants to contribute $32,400 in 2014 to the National Republican Senatorial Committee, a national party committee.

## STANDARD OF REVIEW

Summary judgment should be granted where the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Entry of

summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party must go beyond the pleadings and mere allegations and set forth "specific facts showing that there is a genuine issue for trial." *Id.* at 323. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48. Indeed, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted). The Court reviews the evidence in the light most favorable to the non-moving party.

## ANALYSIS

### A.    Justiciability of Stop PAC and American Future's Claims[6]

The FEC first challenges the justiciability of Stop PAC and American Future's asserted claims based on the doctrines of standing and mootness.

As to standing, the FEC first argues that Stop PAC and American Future do not have standing because they have not suffered any cognizable injury as a result of the challenged scheme under the theory that they have themselves caused the alleged injury by not registering with the FEC early enough. As to mootness, FEC argues that Stop PAC is no longer subject to the six-month restriction under FECA, having become a multicandidate PAC on September 11, 2014, a position that now extends to American Future, which no longer is subject to the six-month restriction as of February 11, 2015.

---

[6] Intervenor American Future has adopted, joined in, and incorporated by reference the arguments presented by Stop PAC in support of its motion for summary judgment and in opposition to FEC's motion for summary judgment.

In support of their standing claim, Stop PAC and American Future argue that they have suffered injuries in fact as a result of the six month delay that conditioned their ability to associate with candidates for political office by contributing more than $2,600 to a particular candidate.  Ostensibly in recognition of their ability to remove any such disabilities by organizing more than six months before the primaries in which they wished to contribute, Stop PAC and American Future, relying on *Citizens United v. FEC*, 558 U.S. 310 (2010), assert that "[i]t is well known that the public begins to concentrate on elections only in the weeks immediately before they are held." For that reason, they argue that they are injured because federal law allows entrenched, longstanding institutional interests to associate with candidates by contributing to the maximum authorized extent, $5,000, whereas members of the general public are crippled by being able to associate to a lesser degree, *i.e.*, through only a $2,600 contribution.

To establish standing, a plaintiff must satisfy the "case or controversy" requirement of Article III by demonstrating that it had the requisite stake in the outcome when the suit was filed and that the alleged prospective injury qualifies for redress. Specifically, the plaintiff must show (1) it has suffered an "injury in fact," (2) the injury is "fairly traceable" to the actions of the defendant, and (3) the injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560.  Here, there is no doubt that the plaintiffs and intervenor American Future have been affected by the challenged contribution limits.  There are, however, substantial issues concerning whether that injury satisfies the constitutional requirements for standing, given the ability of entities such as Stop PAC and American Future to control the timing of their

registrations relative to any particular election.  Nevertheless, the Court will assume, without

deciding, that they have standing for the purposes of challenging the contribution limits.

As for mootness, in order to be justiciable, Article III also requires a live case or

controversy.  *See FEC v. Wis. Right to Life, Inc. (WRTL)*, 551 U.S. 449, 461–62 (2007) (stating

the "case-or-controversy requirement subsists through all stages of federal judicial

proceedings. . . . [I]t is not enough that a dispute was very much alive when suit was filed.")

(alteration in original) (*quoting Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)).  "A

case becomes moot when interim relief or events have eradicated the effects of the defendant's

act or omission, and there is no reasonable expectation that the alleged violation will recur." *Van

Wie v. Pataki*, 267 F.3d 109, 113 (2d Cir. 2001) (*quoting Irish Lesbian and Gay Org. v. Giuliani*,

143 F.3d 638, 647 (2d Cir. 1998)).  However, there is an exception to the mootness doctrine that

applies where the underlying dispute is capable of repetition, yet evading review.  *See WRTL*,

551 U.S. at 462.  Specifically, the exception applies where "(1) the challenged action is in its

duration too short to be fully litigated prior to cessation or expiration, and (2) there is a

reasonable expectation that the same complaining party will be subject to the same action again"

unless the court intervenes.  *Id.* (*quoting Spencer v. Kemna*, 523 U.S. 1, 17 (1998)); *see also

Delaney v. Bartlett*, 2003 Civ. No. 1:02cv0741, 2003 WL 23192145, at *3 (M.D.N.C. Dec. 24,

2003).

Under the "evading review" prong, "[e]lection controversies are paradigmatic examples

of cases that cannot be fully litigated before the particular controversy expires." *Moore v.

Hosemann*, 591 F.3d 741, 744 (5th Cir. 2009).  However, it is unclear under the existing election

case law whether the "capable of repetition" prong applies under the circumstances of this case.

*Compare Davis v. FEC*, 554 U.S. 724, 735 (2008) (holding capable of repetition yet evading

9

review exception applied where case could not be resolved before election concluded and same U.S. Congressional candidate plaintiff who challenged self-financing limitations announced his intent to self-finance another bid for Congress), *and WRTL*, 551 U.S. at 463–64 (applying exception where plaintiff "credibly claimed" a "materially similar" future controversy involving the same parties would occur), *with Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974) (noting that, although the California election was over, case was "capable of repetition, yet evading review" because "the issues properly presented, and their effects on independent candidacies, will persist as the California statutes are applied in future elections"), *and Catholic Leadership Coalition of Texas v. Reisman*, 764 F.3d 409, 422–23 (5th Cir. 2014) (stating that a challenge to a statute's waiting period imposed on new committees was not moot, even though election was over and waiting period would no longer apply to plaintiffs, because the statute would continue to injure plaintiffs by limiting their "ability to *receive contributions* from newly formed general purpose committees" and holding that plaintiffs "need not show they will suffer the exact same injury so long as an injury is caused by the same alleged illegality"). Given the election law context, the Court assumes, without deciding, that the circumstances presented here satisfy both prongs of the mootness exception.[7]

### B. First Amendment Challenges

Stop PAC and American Future argue that the six-month waiting period of section 441a(a)(4) and the monetary contribution restrictions that flow from it to new PACs violate the First Amendment. That position presents the same type of First Amendment constitutional

---

[7] The mootness issues, particularly as to the Fund's challenge to the $15,000 limit, and its previous inability to contribute up to $32,400, has been further affected by FECA amendments on December 16, 2014 that allow multicandidate PACs to give an additional $45,000 to up to three new types of accounts that national committee are allowed to create. *See* Consolidated and Further Continuing Appropriations Act, 2015, PL 113-235, 128 Stat. 2130, 2772-73 (Dec. 16, 2014) (codified as amended at 52 U.S.C. § 30116(a), (d)).

challenges considered and rejected in *Buckley v. Valeo*, 424 U.S. 1 (1976), and *California Medical Association v. FEC*, 453 U.S. 180 (1981), where the Supreme Court rejected a constitutional challenge to contribution limits that, overall, restricted advocacy more than those challenged here. Stop PAC and American Future claim, however, that these cases do not control because they are bringing a more narrow, as applied challenge to restrictions placed on *groups* that have received more than 50 contributors and contributed to at least five candidates, as opposed to *individuals*. The Court finds the relied upon distinctions immaterial to the core holdings of *Buckley* and *California Medical Association*, which dictate the result here.

In *Buckley*, the Supreme Court considered whether the limits the FEC placed on contributions from a person, defined as "an individual, partnership, committee, association, corporation, or any other organization or group of persons," to candidates violated the First Amendment under the theory that, by limiting contributions, the FEC limited the contributor's ability to express his political views through the speech of another. Although the Court recognized that contribution limits "implicate fundamental First Amendment interests," it upheld various ceilings on contributions. *Buckley*, 424 U.S. at 23. Specifically, the Court upheld a $1,000 limit on contributions from individuals or groups to candidates for federal office and a $5,000 limit on donations from PACs. The Court reasoned that contribution limits are such "marginal restriction[s]" that they involve "little direct restraint" on contributors' ability to express their own political views. *See id.* at 20–21 (reasoning that "[w]hile contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor").

11

In *California Medical Association*, the Supreme Court considered whether a contributor's rights were impaired by limits on the amount he could contribute to a PAC that advocates the views and candidacies of candidates. Determining that the analysis in *Buckley* controlled the issue, the Court held that the rights of a contributor were not impaired by limits on what he could contribute to an advocacy PAC, reasoning that this form of "proxy speech" was too attenuated to garner constitutional protection. *See id.* at 196 (deciding the "sympathy of interests" between the PAC and the contributor did not convert the PAC's speech into that of the contributor, thus not entitling PAC speech to full First Amendment protection). These rulings apply with equal or greater force to a legislative scheme that allows a non-connected PAC to make separate $2,600 contributions to many candidates.

Here, Stop PAC made contributions to five candidates 24 days after registering with the FEC and had the ability to make such contributions to any other candidate it chose. Similarly, American Future contributed $2,600 to Tom Cotton, and had the ability to make many other such contributions. Stop PAC and American Future therefore had the ability to make, and in fact made, greater contributions than the plaintiffs in *Buckley,* whom the Supreme Court concluded had not suffered a constitutional injury. In light of *Buckley*, Stop PAC and American Future cannot show that they have suffered a cognizable constitutional injury as a result of the waiting period, even if they would have made a higher contribution, had they been permitted to do so.[8] Stop PAC and American Future were able to associate with, express approval of, and contribute to their chosen candidates through monetary contributions; and under *Buckley*, the limits placed on those contributions do not translate into a First Amendment infringement. *See Buckley*, 424

---

[8] *See* Am. Comp. ¶¶ 21, 25, 30 (alleging that it had the ability and desire to make additional contributions).

12

U.S. at 21 (reasoning a campaign contribution limit involves little direct restraint because it "permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues").

Likewise, Stop PAC and American Future did not sustain a constitutional injury as a result of the six-month waiting period, which did not restrict their ability to participate in political activity, other than through direct financial contributions. FECA does not restrain new PACs or their individual contributors from otherwise assisting the campaigns and political activities of their selected candidates. For example, Stop PAC and American Future's contributors were free to engage in independent political expression during the six-month waiting period through such activities as raising their own funds to support candidates, volunteering their time to work on candidates' campaigns, and voting for the candidate of their choice, and Stop PAC and American Future could have spoken independently in favor of, or organized volunteer efforts to support, candidates of their choice. *See Gottlieb v. FEC*, 143 F.3d 618, 622 (D.C. Cir. 1998). In fact, Stop PAC and American Future have not claimed that their ability to engage in any specific protected speech has been stifled or compromised by the delay. *See Buckley*, 424 U.S. at 21 (reasoning that "[t]he quantity of communication by the contributor does not increase perceptively with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing").

Overall, *Buckley* makes clear that, within jurisprudential limits not exceeded here, the limited effect on First Amendment freedoms imposed by restrictions on the size of financial contributions from individuals and PACs to candidates and their political committees does not unconstitutionally infringe on political speech. *California Medical Association* makes clear that limitations on contributions from persons to PACs, even PACs that engage in advocacy and

13

"proxy speech," receive less First Amendment protection than direct individual contributions to candidates. Because this case does not involve an individual contributor, the First Amendment, under these Supreme Court precedents, provides Stop PAC and American Future with limited rights, not offended here, with respect to their ability to make political contributions. Accordingly, the Court concludes that FECA's six-month waiting period, and the limited restriction that it places on financial contributions from PACs, do not constitute a First Amendment violation of Stop PAC and American Future's ability to associate with the candidates whom they support.

### C.    Fifth Amendment Equal Protection Challenges

Plaintiffs also seek protection under the Fifth Amendment from the per election contribution limits imposed on amounts new PACs can contribute to candidates and the annual contribution limits placed on amounts multicandidate PACs, such as the Fund and ARCC, can contribute to national, state, and local party committees. The FEC argues that FECA's restrictions do not violate the Fifth Amendment because the restrictions are not discriminatory and, in any event, new PACs and multicandidate PACs are not similarly situated for the purposes of any equal protection analysis.

A contribution limit violates the equal protection component of the Fifth Amendment if plaintiffs can show they were treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus. *See Equity in Athletics, Inc. v. Dept. of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011). The equal protection claim here reduces to whether a difference in treatment may be legislated with respect to a group of political committees that has more than 50 contributors and contributed to at least five federal candidates based on when a political committee registered with the FEC. This inquiry involves three

14

questions: (1) are the political committees that have been registered for less than six months
similarly situated to those that have been registered for more than six months? (2) If so, what is
the appropriate level of scrutiny? (3) Depending on the appropriate level of scrutiny, is the
government's purpose sufficiently important and is the statutory classification sufficiently
connected to that purpose? *See Riddle v. Hickenlooper*, 742 F.3d 922, 925 (10th Cir. 2014).

In assessing these claims, the Court must recognize that the legislation at issue, as a
whole, places fewer restrictions on PACs than some other regulated persons or entities. *See
California Medical Association*, 453 U.S. at 200 (holding that "claim of unfair treatment [based
on limitations on contributions different than other regulated entities] ignores the plain fact that
the statute as a whole imposes far *fewer* restrictions on . . . associations than it does on
corporations and unions"); *see also* 52 U.S.C. §§ 30118 and 30121 (restricting certain persons
and entities from making contributions altogether). In short, plaintiffs' claims of
unconstitutional discrimination must be assessed within the broad context of the overall
legislative scheme that Congress adopted.

Separate entities are "similarly situated" "if they are alike in 'all relevant respects.'"
*Riddle*, 742 F.3d. at 926 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). The Fund and
Stop PAC argue that they are materially identical because they both have more than 50
contributors and have contributed to five or more candidates (perhaps even the same candidates),
engage in the same activities, and have the same goals, yet are subject to different contribution
limits depending on when they registered with FEC. But Stop PAC and the Fund are not
"similarly situated" when considered relative to core, legitimate legislative purposes. By its
own description, Stop PAC is a "grassroots organization," as compared to the more "entrenched"
multicandidate PACs. *See* Am. Compl. at 1. As such, Stop PAC is precisely the type of

instrumentality that lends itself to a circumvention of the contribution limits applicable to individuals. The risk of circumvention is particularly great during the initial months of a PAC's creation, which often coincides with the period immediately before an election when the incentives to infuse funds to a candidate are at their highest. *See, e.g.*, Clark Decl., Doc. No. 57, Ex. 11 (showing that in 2008 the busiest month for PAC registrations was October, just before the November election and stating that since 2003, 5,084 PACs have registered with the FEC, and approximately 77 percent of those PACs had not become multicandidate PACs as of August 26, 2014). For example, when Stop PAC had been registered with the FEC for one month it was comprised of approximately 150 contributors and had contributed to five candidates for federal office, with Stop PAC's two largest contributors providing a significant portion of Stop PAC's receipts. On the other hand, the Fund is a broad-based interest group. When it had been registered with the FEC for two years it had over 100,000 contributors and had contributed to dozens of federal candidates. For these reasons, the Court concludes that Stop PAC, during the initial six month period following registration, and multicandidate PACs, such as the Fund, are not similarly situated, the FECA does not improperly discriminate among such committees; and the FEC does not violate the plaintiffs' rights under the Fifth Amendment. [9]

Even if the PACs were similarly situated, under either rational basis or intermediate scrutiny, there is sufficient government interest to justify the FECA contribution limits. *See, e.g., Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 387 (2000) ("It has, in any event, been plain ever since *Buckley* that contribution limits would more readily clear the hurdles before them."); *see also Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1091 (9th Cir. 2003) (reasoning that after *Shrink Missouri* courts "need not be overly concerned with the precise

---

[9] Because the Court finds that new committees and multicandidate PACs are not similarly situated, it does not consider the second and third questions under an Equal Protection analysis.

standard of scrutiny to be applied"). Specifically, there is sufficient government interest in preventing the risk of corruption of the political process and the circumvention of the legislative and regulatory systems to justify the limits on contributions from new PACs, or "persons," to candidates and from multicandidate PACs to parties. *See, e.g., Buckley*, 424 U.S. at 26 (justifying limitations on contributions from individuals to candidates based on statute's primary stated purpose of limiting the actuality and appearance of corruption).

For the above reasons, the Court will enter summary judgment in favor of defendant Federal Election Commission and deny the motion for summary judgment filed on behalf of plaintiffs Stop Reckless Economic Instability Caused By Democrats, Tea Party Leadership Fund, and Alexandria Republican City Committee and intervenor American Future.

The Court will issue an appropriate Order.

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
February 27, 2015

17